CHASEZ, Judge.
This is a suit on a rotary drilling contract which existed between plaintiff, Buster Gardner Drilling Co., Inc. and defendant, Associated Oil & Gas Exploration, Inc. Plaintiff, referred to hereinafter as Buster Gardner, agreed to drill a well, known as B.C. Herbert #1 in the East White Lake Field located in Vermilion Parish, Louisiana. The owner of the well is the defendant referred to hereinafter as Associated Oil & Gas. The contract footage depth of the well is 7000 feet for which the driller would be paid on a footage basis. If he should encounter formations difficult or hazardous to drill or should he be required to drill deeper then, after certain conditions are met, he would be paid on a day-rate basis.
The object of this suit is plaintiff’s demand for the sum of $23,750.00 due on a day-rate basis since he alleges that he has satisfied the contract prerequisites to receive this type payment. The defendant has denied that these conditions have been satisfied and has demanded in reconvention that plaintiff is liable to him for the sum of $26,019.97 that he expended to retrieve lost tools and pipe which are normally the responsibility of the driller un *269 less he is operating on a day work basis. (These responsibilities are more explicitly set out in the. contract.)
After the plaintiff’s petition was filed, defendant joined issue and set up special defenses. He joined in a motion to fix trial, but after the case was called, the defendant urged his right for trial by arbitration as specified by the contract. The lower court granted an order staying the proceedings and referred the cause to arbitration. The plaintiff then applied to this court for a writ which was granted and the case was reinstated on the lower court docket to be tried on the merits. In due course the trial was completed and judgment was rendered in favor of the plaintiff in the sum of $23,750.00. From this judgment defendant has taken a sus-pensive appeal.
The evidence contained in the record reveals that pursuant to the contract, Buster Gardner began work on the well in November, 1964. The drilling progressed normally to a depth of 6726 feet when on November 19, 1964 the drill pipe was stuck in the hole. As will be explained in more detail hereinafter the cause of sticking the drill pipe is the basis of plaintiff’s claim to be paid on a day work basis.
After the drill pipe had become securely stuck, the drilling crew in attempting to free the pipe damaged the clutch which halted their operations for three days. When they were finally able to resume their work on November 22nd, they began fishing operations to retrieve the stuck pipe. Deltide Fishing & Rental Tools, Inc. and Dia-Log Company were employed to conduct these operations. The fishing operations were successful and the hole was finally completed according to the contract.
The sum of $26,019.97 plus 5% interest per annum which was demanded in re-convention represents the costs of the fishing operations conducted by Dia-Log Company and Deltide Fishing & Rental Tools, Inc.
Appellant has appealed the judgment of the district court alleging the following specifications of error: “(1) This court erred in failing to uphold the arbitration clause of the drilling contract. (2) The trial court erred in finding facts and interpreting the drilling contract so as to permit recovery by appellee herein. (3) The trial court further erred in failing to give judgment in favor of appellant on its reconventional demand.”
In response to these allegations we now direct our attention to each question as it is posed to us. With respect to the possibility that the cause should have been submitted to arbitration as specified under certain conditions in the drilling contract, we find that this question has already been adjudicated by this court, and its judgment thereon has become final.
By judgment dated Jan. 6, 1967, the Court of Appeal, Fourth Circuit ordered this case reinstated on the docket of the Civil District Court for the Parish of Orleans in order that it be tried on the merits. This judgment was in response to relator’s writ which was granted and thereafter no timely application for a rehearing was filed.
The judgment on the writ having become final, the defendant, Associated Oil & Gas, is allowed no supplemental review by this court, since it did not pursue further appeal, as provided by Uniform Rules of the Courts of Appeal, Rule 12 § 7. (c. f. Code of Civil Procedure, art. 2167.)
The second question in this appeal is admittedly one of fact, and the final resolution of this question controls the outcome of plaintiff’s demand. As stipulated by both parties, the drilling contract dated October 25, 1964 establishes the relation of the two parties in this suit. Under the terms of that contract, the owner (Associated Oil & Gas) agreed to pay the driller (Buster Gardner) on a footage basis to a depth of 7000 feet and on a day work basis if he is to drill beyond 7000 feet or if he *270 should encounter formations difficult or hazardous to drill. The paragraph known as the Gulf Coast clause which defines the change from a footage rate of pay to a day work scale is quoted in pertinent part as follows:
“13.2. In the event of loss of circulation, partial loss of circulation, water flow, domal formation, abnormal • pressures, heaving shale, or similar formation, salt or other similar condition, is encountered which makes drilling abnormally difficult or hazardous, causes sticking of drill pipe or casing, or other similar difficulty which precludes drilling ahead under reasonably normal procedures, Contractor shall, in all such cases, without undue delay, exert every reasonable effort to overcome such difficulty. When such condition is encountered, Owner shall assume risk of loss or of damage to the hole and to Contractor’s equipment in the hole. Should such condition or conditions persist in spite of Contractor’s efforts to overcome them, then after a period of twenty-four (24) hours time consumed in such efforts, further operations shall be conducted on a day work basis at the applicable day work rate until such conditions have been overcome and normal drilling operations can be resumed. The total time furnished by Contractor under the terms of this paragraph shall be limited to twenty-four (24) hours. The footage drilled while on day work basis shall be deducted from the footage charge.”
The petition alleges that defendant is indebted to plaintiff for those services rendered towards the fulfillment of the contract which are payable on a day work basis. Although defendant has already paid plaintiff the sum for the footage drilled under the contract, he contests the alleged amount due on a day work basis. Plaintiff grounds his claim on paragraph 13.2 of the contract, the Gulf Coast Clause, alleging that he encountered a loss of circulation of drillling mud and thereafter stuck his drill pipe. He further asserts that he exerted every reasonable effort to overcome his difficulties, but was unable to free the stuck drill pipe during a period from Nov. 19, 1964 to Dec. 8, 1964 during which period defendant is liable on a day work basis as per paragraph 13.2 of the contract.
Defendant denies the allegation that circulation was lost prior to the sticking of the drill pipe; he alleges that the pipe was stuck due to the plaintiff’s failure to perform his drilling operations properly. In regard to this defense, he alleges that the plaintiff should have thoroughly circulated the drill cuttings out of the hole before removing the bit and because these cuttings were left in the hole they became packed around the drill collar and caused the bit to stick.
The fact question then before the court is narrowed to whether a loss of circulation occurred first, thereby allowing the walls of the hole to slough in and stick the drill pipe or whether the unremoved cuttings packed around the drill collar sticking the bit and causing a loss of circulation. As noted from a close reading of paragraph 13.2, if a loss of circulation is first encountered, then after certain steps are taken the defendant would be indebted to the plaintiff on a day work basis. If on the other hand, the plaintiff’s lack of due diligence and care (cf.. Paragraph 10.1 of the contract) should cause the bit to stick, then the plaintiff’s claim fails. Thus our attention now focuses on the question of fact as to which occurred first, the loss of circulation or the- sticking of the drill bit from causes attributable to the driller.
At this point we feel we should voice our opinion as to the plaintiff’s responsibility to make out his case. By this we mean that we feel the burden of proof is on the plaintiff to show that during his normal drilling operations a loss of circulation which was beyond his control occurred thereby effecting the terms of paragraph 13.2 which places the financial re *271 sponsibility on the owner. Therefore we shall appraise the evidence introduced in this case from the viewpoint that initially the plaintiff must show a loss of circulation not caused by his own lack of care in order to hold the defendant financially responsible under paragraph 13.2 of the drilling contract. The defendant need only rebut the evidence of a prior loss of circulation raising the defense that the driller failed to exercise due care and diligence.
Of the witnesses presented at trial, they are almost evenly divided as to those testifying that circulation was lost first as opposed to those testifying that the driller’s lack of care caused the stuck drill-pipe. It is also noted that those testifying that the owner would be responsible were largely in the employ of the driller, and those testifying that the driller was responsible were either employed by or experts presented by the owner. From this observation we do not mean to imply that any witness has tempered his testimony with his personal interests, but only observe that no one is really sure what happened at the approximate 6700 foot depth at which the drill pipe was stuck, and therefore any witnesses’s explanation of the occurrence naturally follows the analysis which removes the stigma of error from those with which the witness is personally aligned.
We therefore have tempered our analysis of this suit with the assumption that the most logical explanation should be given the most weight.
The trial judge has, of course, heard this evidence in the three day trial of the case, and he rendered judgment in favor of the plaintiff. But with all due respect to the judge of the lower court, his judgment must be taken in the light of his repeated protestations during the course of the trial that he was unfamiliar with the technological data of the oil and gas industry as introduced in this suit, and that he had quite a bit of difficulty following the expert testimony of several witnesses presented at the trial.
Although cognizant of the presumptions attaching to the trial judge’s opportunity to observe the witnesses and the weight of the manifest error rule, we feel that in a suit where almost every witness is an expert and all the testimony given was stated in, sophisticated technical language, then the appellate court has perhaps some advantage in reading the naked transcript slowly and with care, because it is not distracted by the physical presence of the witnesses or the proceedings of the trial. Therefore, we shall independently review the evidence presented in this case, to determine whether the conclusion reached by the trial court was correct.
Up to the point of the initial sticking of the drill pipe, the facts as developed in the record are uncontroverted. Two witnesses who were present at the well at the time the bit was stuck, Mr. Wilfred Dugas, the driller, and Mr. Ernest Waldrop, the tool pusher, both testified that they had encountered no difficulty when drilling to a depth of 6726 feet. As reflected in the drilling report, they had successfully drilled the last 76 feet in four hours when it became necessary to change the bit. They then removed the drill pipe, replaced the bit and returned the drill column to a point some 33 feet off the bottom of the hole. This process, known as a round trip, took approximately six and one-half hours. When the drill bit was returned to a point some 33 feet from the bottom of the hole, the Kelly[1] was attached to the top of the drill pipe, and the mud pumps were turned on, but the drill pipe would not rotate. The driller then worked the pipe up and down for ten to fifteen minutes until the pipe became securely stuck in the hole.
A very important aspect in the drilling process is the status of the mud column in the well; indeed the disposition of the *272 mud is determinative of the alleged loss of circulation[2]. During the drilling of the .final 76 feet circulation of the mud column was normal. That is while drilling, mud was being pumped down the drill pipe and it circulated along the outside of the drill pipe back up the bore hole over the shaker at the surface.[3] This process of circulating mud through the bore hole serves two purposes: 1) it helps remove the cuttings of the drill bit and carry them out of the bore hole to the surface where they are eliminated over the shaker. 2) Its hydrostatic pressure aids in restraining unconsolidated formations along the length of the bore hole so that they are not able to slough in on top of the drilling equipment.
While drilling the mud in the bore hole was carefully watched at all times. When all of the pipe was taken out of the hole, the driller was careful to keep the hole filled with mud, and when the drill pipe was returned to the hole and lowered to the point some 33 feet off the bottom, it was observed that the mud displaced by the drill pipe came out over the shaker. Thus up until this point, circulation was maintained.
But after the Kelly was put on and the mud pumps were turned on, there was no mud returning to the surface. At first they attempted to rotate the drill bit, but because the drill bit wouldn’t rotate, they worked it up and down for about fifteen minutes. After this short period the bit could neither be rotated nor worked up and down. The drill pipe was securely stuck and they subsequently burned out a clutch trying to free it. As noted by both driller and tool pusher,[4] there was no circulation of mud after the Kelly was attached and during the time which the pipe was worked up and down, and it is on this fact that plaintiff bases his claim that the mud was lost somewhere else along the bore hole subsequently causing the stuck drill bit.
We do not agree that simply because there was no circulation just prior to the sticking of the bit, testified to by these witnesses, that the defendant is necessarily liable on a day work basis. Indeed, because of the short amount of time between the alleged loss of circulation and the sticking of the drill bit, we are alerted that the sequence of events may have occurred almost simultaneously for which the plaintiff would be held responsible.
One expert witness, R. J. Meers, a petroleum engineer, stated that due to the cuttings having been left in the hole, the annulus above the bit could have become plugged and this impediment could have prevented free circulation. Thereafter with no circulation, the remainder of the cuttings could have packed around the large heavy drill collar preventing rotation which finally resulted in securely sticking the drill bit. We are further led to this conclusion by several witnesses having testified that the pipe was stuck low in the hole, i. e. at some point deep below the surface rather than higher up along the bore hole. Thus, a logical explanation of the sequence of events leading up to the stuck drill pipe and concomitant loss of circulation would include the failure to circulate the cuttings from the bot *273 tom of the bore hole as a cause of this misfortune.
We feel not only is it a fact that the drill hit could have compacted the cuttings remaining in the hole enough for them to bind the drill collar, hut that this explanation is the more probable conclusion. Although plaintiff has produced witnesses that testified that circulation was lost on two occasions during washover operations once at the bottom of the casing (989 ft) and once around 1300 feet, we are not convinced that this loss of circulation did not result by the very nature of the wash-over process.[5] Further once the drill pipe remains inactive in a bore hole for three days, the walls of the hole can close in on the drill pipe causing it to be stuck the entire length of the column. Thus, the inactivity coupled with the previous movement up and down without good circulation could have caused the walls of the bore hole to slough in. The three day inactivity of the drill column has served to complicate the experts’ analysis of how and where the pipe was stuck. However we have arrived at the conclusion that it must have stuck deep in the hole due to several witnesses (both for plaintiff and defendant) having testified as to the amount of stretch in the pipe.
Thus considering the fact that the pipe was probably stuck deep in the hole, taken with the testimony of the driller who stated he had no drag on the bit when he returned it to the bottom plus the fact that the hole was full of mud just prior to putting the Kelly on, we do not understand how the walls could have sloughed in from depths of 1000 or 1300 feet nor further how this material could have sunk in the hole to stick the pipe at a much greater depth. We think the testimony supporting the argument that the walls heaved or sloughed in on the drill pipe and the evidence of sand, gravel, and shells inside the casing could be attributed to the condition of the hole after the bit stuck and the pipe remained in the hole three days without any movement. And although we respect the expertise of the witnesses testifying to this fact, it appears more logical that the drill pipe stuck deep in the hole due to the driller’s lack of circulating the cuttings out of the bottom of the hole, and this lack of care was the most probable cause of the stuck drill pipe.
As we stated earlier the cuttings remaining in the hole could have packed around the drill collar and this would explain the almost simultaneous loss of circulation. We cannot conclude that circulation was lost through some geological fault or that the drilling could be termed abnormally difficult or hazardous such as to affect t he day work rate of pay as provided for in paragraph 13.2 of the contract.[6] Further, we do not think plaintiff has proved his allegations to the certainty required in this case.
 Plaintiff has the burden of proving by a preponderance of evidence that the above conditions enumerated in the Gulf Coast Clause were present in order to recover on a day work basis, and we have concluded that his proof is insufficient to establish this responsibility. We rather think that defendant’s explanation that the plaintiff failed to circulate bottoms up is the more probable cause of his misfortune and therefore this claim against Associated Oil & Gas should be dismissed and the judgment of the lower court in that respect is to be reversed.
*274 The defendant and plaintiff in reconvention has prayed for the recovery of a sum of $26,019.97 and 5% interest per annum which it was ordered to pay Deltide Fishing & Rental Tools, Inc. and The Dia-Log Company for services rendered in the fishing operations for the stuck pipe.
Under the Exhibit A of the contract initiated by the parties thereto and entitled Specifications & Special Provisions, No. 5 defines the equipment, materials and services to be furnished by the Contractor (the driller).. No. 5.4 provides that the driller furnish “contract fishing tool services and fishing tool rentals (except while on day work).” Also No. 6.12 provides that the owner provide “Contract fishing tool services and fishing tool rental while operating on a day work basis.” Thus, it is the plain intention of the parties to this contract that the driller shall be responsible for fishing operations except when he is on a day work basis. And since our judgment on the facts in this case necessarily precludes the driller’s recovery for a day work rate of pay, then he is liable for expenses incurred during fishing operations as provided by the contract. Therefore, defendant’s demand in reconvention shall be honored to the extent that plaintiff is liable for all fishing expenses enumerated by the contract.
For the foregoing reasons it is ordered, adjudged and decreed that the judgment of the court a qua rendered herein on June 30, 1967 in favor of Frank Mosing as as-signee of the plaintiff, Buster Gardner Drilling Co. Inc. and against the defendants, Associated Oil & Gas Exploration, Inc. for the sum of $23,750.00, together with legal interest thereon from judicial demand until paid and all costs, is reversed and set aside.
It is further ordered, adjudged and decreed that there be judgment herein in favor of defendant and plaintiff in recon-vention, Associated Oil & Gas Exploration, Inc. and against Buster Gardner Drilling Co. Inc., plaintiff and defendant in recon-vention in the full sum of $26,019.97, with legal interest thereon from date of judicial demand until paid, and all costs of court.
All costs of the appeal in this court shall be borne by plaintiff and appellant, Buster Gardner Drilling Co. Inc.
Reversed and rendered.

. The Kelly is a special drilling device which is down. used to either rotate or move the pipe up and

. If the mud -was lost through some geological fault in the borehole then that could be the cause of lost circulation in this case. On the other hand if the mud was of improper consistency or not circulated properly then that could be the cause of the stuck drill pipe.

. The shaker is a device which eliminates bore cuttings and foreign materials borne up out of the hole while suspended in the mud.

.The drilling report which normally would have the loss of circulation noted on it strangely does not include that rather important notation. We have not given this omission the weight of conclusive proof as to the sequence of events when the pipe was stuck. However, it does show the possibility of human error in describing these rather important events.

. The washover process involves a larger wash pipe fitted with a rotary shoe at its base to be lowered over the stuck drill pipe. Mud is then pumped down the wash pipe under pressure which frees the pipe stuck in the hole. The drill pipe thus freed can be removed from the hole.

. In support of this conclusion, witnesses with vast experience in the East White Lake Field testified that no other wells in that field had experienced loss of circulation above 7000 feet.