REDMANN, Judge.
Plaintiff was drilling for defendant a 6,500 foot oil or gas well under a day-work contract when the well blew out and burned. Plaintiff sued for the price of its day-work; defendant reconvened (adding plaintiff’s insurer as a defendant-in-reconvention) for its losses. It was stipulated that, unless the loss was due to plaintiff’s negligence or breach of contract, plaintiff is entitled to judgment for $10,084.04; if the loss was attributable to plaintiff, defendant is entitled to judgment against plaintiff and its insurer for $23,356.33. From a trial court judgment in favor of plaintiff, defendant appeals. We affirm.
Under a day-work contract, the contractor provides the equipment and personnel, including a 24-hour superintendent (“tool pusher”), at a per diem cost to the operator for whom and according to whose instructions the well is to be drilled.
Natural gas at differing pressures may be encountered in drilling. One force that tends to prevent the escape of the gas is the pressure resulting from the sheer weight of the column of viscous drilling mud, with which the hole being drilled is ordinarily kept filled and which is ordinarily constantly circulated through the drilling pipe or stem, out the bit and back up to surface mud tanks. The mud’s hydrostatic pressure increases in proportion to the height of the column (and the density of the mud). As long as the mud’s pressure exceeds the gas pressure, no troublesome escape of gas can occur.
When the gas pressure does become higher than the mud’s it begins to displace mud, thus reducing the effective height of the mud column and therefore reducing the mud pressure even more.
The circulation of fresh mud down the drilling stem and out of the bit (ordinarily) at the bottom of the hole serves to maintain the mud column at a proper density and to prevent the accumulation of gas by forcing it up in smaller bubbles, “entrained” in the mud column and exhausted into the surface tanks. (Circulation also serves to remove the bit cuttings, a function not of concern here.)
If, however, gas pressure does exceed mud pressure in this self-accelerating fashion, the threatened blowout is ordinarily controlled by preventers, which serve to seal the “surface casing”. Ideally, the well hole is then a sealed tube into the underground, through which a second tube (the drilling pipe or stem) should be the only other opening (excepting possible emergency lines), and it is also sealable, apparently by different processes under differing circumstances.
The blowout preventers are fixed in series atop the surface casing, and the drilling pipe passes through them. The preventers actually used here were in a “space saver” containing both blind rams and pipe rams. The latter is made the same diameter as, and closes exactly over, the drilling pipe being used; the former closes only when there is no drilling pipe (or other obstacle) in its way. However, here a 6" diameter drill collar, larger in diameter than the drilling pipe, was in the preventers at the time of the blowout, making them unable to effectively seal the hole.
There is another type of preventer, described as a Hydrill, which seals effectively irrespective of the shape of the object within it. Use of such a preventer was not specified by the owner (plaintiff-in-reconvention) here. Had a Hydrill been in use, it could have closed upon the drill collar, although some space between collar and stem would have remained.
*737 Also, pertinent, at least in plaintiff’s view of this case, is that the ideal sealed tube effect (with preventer rams closed) may also be defeated if the surface casing is not adequately cemented as intended. This well began with 142 feet of 13$4" O. D. conductor casing being driven into the ground. Then, through it, an 11" hole was drilled to 832' and (about) 832' of 8Y%" 0. D. surface casing was introduced. At that point, between those coaxial pipes a ring of space over an inch wide on all sides existed, through which (if unfilled) gas could escape from the 832' depth to the surface. But cement is introduced through the surface casing to 832', with drilling mud supplying a subsequent pressure to force the cement outside of the surface casing and up, in an attempt to fill and seal that annular space between surface casing and the 11" hole, at least towards the bottom of the surface casing. However, the wall of the 11" hole may not have sufficient cohesiveness to remain only 11" wide, and is not an impermeable surface, but may have porous strata or even an occasional somewhat empty space. Some quantity of the cement may not be forced up the annular space but may be lost in the underground formations. Here, cement in an amount 100% in excess of the theoretical volume of the annular space was introduced, but did not in fact return to the surface between conductor and surface casings (as it would have done, in quantity, were the entire 832' hole exactly 11" wide and of an impermeable character).
The owner-operator (defendant and plaintiff-in-reconvention) charges that the blowout occurred because of plaintiff’s withdrawal of the drilling stem from the hole under circumstances hereafter described, it being the owner’s view that this withdrawal reduced the mud column pressure, facilitating a blowout while at the same time (because the larger-dimension drilling collar was brought up into the pre-venters) rendering the blowout preventers inoperable.
Plaintiff’s view is that its withdrawal was not negligence nor a breach of its contractual obligation of good workmanship, and, moreover, that the blowout occurred not through the surface casing but through the annular space between conductor and surface casings.
The circumstances at the time of withdrawal were that, with the hole at 2,175 feet, the rotary clutch required repair and (prudently) plaintiff lifted the bit up from the bottom of the hole into the lower end of the surface casing, from which point mud circulation was maintained. This step consumed some three hours. The bit stayed at this approximately 832' level some five hours, during which the entire mud column consisted of (apparently) a relatively un-circulated or static portion, below the 832' surface casing level, plus a circulating portion, from that point to the surface.
Because of the possibility that gas may have been accumulating in the uncirculat-ing mud in the lower portion of the hole in that five-hour period, defendant’s two experts opined it was negligence (one said “inexcusable”) on plaintiff’s part to elect to lift up the drill pipe (to determine whether the bit should be replaced) without first making a “short trip” to the bottom of the hole to circulate mud from the bottom and to leave a full supply of fresh heavy mud in the column. (They also opined that the drilling pipe withdrawal would pull some mud with it and slightly reduce the column’s hydrostatic pressure, despite circulation’s effect of replenishing the mud column.)
Yet, because of the absence of the rotary clutch, plaintiff’s expert opined it would have been negligence to make the short trip since the bit may have become stuck, causing the necessity of an expensive “fishing” operation. (One defense expert contradicted this by describing the chance of getting stuck as “awfully slim.”)
We may observe, however, that while this testimony suggests it may have been prudent not to make a short trip under the *738 circumstances, it does not of itself suggest that withdrawal without a short trip was prudent under the circumstances. Plaintiff’s expert O’Connor’s opinion on that question was confusing if not contradictory.
The only fact witnesses relative to the blowout were Wade Montet (the tool pusher) and John Broussard (a driller).
Broussard was at the draw works controls on the derrick floor when he heard a noise “come down from the bottom of the floor, you know, hitting bottom of the floor.” He attempted to unscrew the clamp from the first drill collar in the rotary, but more noise came. The drill collars, heavier pipes of greater diameter, are placed over the drilling pipe immediately above the bit to increase the bit pressure. The topmost collar was, at that moment, projecting about two and a half feet through and above the rotary table (which is on the derrick floor, above the drilling nipple, and then the mud return line, and then the preventers). While attempting to unscrew the drill collar clamp, Broussard was right at the rotary table (which has a hole in line with the surface casing, etc.), but, he testified, he saw nothing coming out. Although shims (between collar and drilling pipe) and clamp occupied some half of the space through which expelled material might have come through the rotary table, and might divert that material against the bottom of the derrick floor immediately above the drilling nipple (as the owner suggests might explain the sub-floor noise), Broussard testified that nevertheless expelled material could pass those shims quite easily and in fact none did.
Montet, the 24 hour supervisor, was asleep in his car at the time the blowout began, but “about a minute after it happened” went to the accumulator unit (which operates the preventers) when “that whole thing came from under the surface and hit me in the face.” The blowout “never did come through the drill pipe.’"
John C. O’Connor, Jr., plaintiff’s consultant Petroleum engineer, testified that, if the blown-out material was hitting the under-floor of the derrick, but nothing was coming out of the rotary table with the drill collar in it (as Broussard testified), he would be of the opinion that the well was blowing out between the surface casing and the conductor casing (rather than from within the surface casing) ; and that the emission from the ground level felt a minute later (as testified by Montet) would confirm that opinion.
O’Connor theorized that the cement job may have risen only to a relatively low level above the 832' depth of the surface casing, leaving the balance of the annular space filled only with the pre-cement drilling mud. Over the period of several days involved, the mud could have “percolated” into underground formations, dropping down until it reached an equilibrium in pressure with some formation. Evaporation or vibration could have disturbed that delicate balance, ultimately allowing a gas build-up to flow through the annular space and cause the blowout.
Also considered corroborative by O’Con-nor of blowout from annular space rather than surface casing were photographs showing the drill stem remained in the hole. Usually, he said, a blowout from a hole will lift out whatever is in the hole.
There was a relative unanimity of the experts that the most frequent, or a very frequent, incidence of blowouts is at the time the drilling pipe is being withdrawn and nearing the surface. Defendant’s experts said withdrawal was the most common cause. Nevertheless, in our judgment, the factual circumstances and O’Connor’s expert testimony more than adequately support the trial court’s judgment, and prevent our concluding it was erroneous.
Defendant argues that the most logical explanation should prevail, citing Buster Gardner Drilling Co., Inc. v. Associated Oil & G. Expl. Inc., 214 So.2d 267 (La. *739 App.1968), writ refused 253 La. 59, 216 So.2d 306. Defendant’s explanation could perhaps be said to be more logical in the abstract, assuming no facts other than the time the bit was off bottom and the fact of withdrawal without a short trip. But we must add the facts, according to two witnesses’ testimony (even if defendant disagrees) to the effect that the emission came from below the derrick floor and no emission came through the rotary table, and the further fact that the drill pipe was not blown out of the hole by the blowout. One of defendant’s experts did testify he later found evidence of a blow around the drill collars; but plaintiff’s expert testified this could happen after the first blowout was well underway. We conclude plaintiff’s explanation is the more logical under all the circumstances.
The judgment is affirmed.
Affirmed.